United States District Court
Southern District of Texas
**ENTERED**
March 31, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL E. ROBERTS, a/k/a §
MICHAEL REYES ROBERTS, §
TDCJ-CID #01887766, §
§
*Plaintiff*, § CIVIL ACTION NO. H-14-0903
§
v. §
§
THE CITY OF HOUSTON, *et al.*, §
§
*Defendants*. §

## MEMORANDUM OPINION AND ORDER

Pending before the Court is defendants' motion for summary judgment (Docket Entries No. 94, 95, 96). Plaintiff, a state inmate proceeding *pro se*, filed several pleadings in response, including a declaration of undisputed facts (Docket Entry No. 97), his opposition to the motion (Docket Entry No. 98), his "credentials" (Docket Entry No. 100), his "rebukes" (Docket Entry No. 101), and his "final supplement" in opposition to the motion (Docket Entry No. 104). Defendants filed a reply to plaintiff's opposition (Docket Entry No. 99).

Based on consideration of defendants' motion for summary judgment, plaintiff's various responses, defendants' reply, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons that follow.

## I.  BACKGROUND AND CLAIMS

Plaintiff filed this *pro se* section 1983 lawsuit against the City of Houston, former Police Chief Charles McClelland, Officer C. McClain-Ferdinand, Officer K. Feddersen, Sergeant R. Espinoza, Sergeant B. L. Chebret, Sergeant R. Gonzales, Sergeant J. Rubio, Officer A. Beaudion, and Dr. Chidi Nnaka for alleged violations of his constitutional rights.

The probative summary judgment evidence shows that, on the night of July 16, 2013, plaintiff and defendant Houston Police Department ("HPD") Officer Ferdinand were involved in two motor vehicle collisions with each other in Harris County, Texas.  Ferdinand, wearing a HPD uniform, was driving her personal vehicle to work.  (Docket Entry No. 94, Exhibit A.) Although plaintiff disagrees with the defendants as to how the two collisions occurred, it is clear that he was driving away from Ferdinand after both collisions and that he subsequently struck another vehicle in a third collision.  Ferdinand stated that she had followed plaintiff's vehicle to obtain the license plate number, and witnessed him run several stop signs before colliding with the other vehicle.  *Id*.  She stopped to investigate the collision and render aid, and stated that plaintiff was very hostile and violent towards her and had a strong odor of alcohol.  She attempted to restrain him and place him under arrest on suspicion of driving while intoxicated, but he resisted her efforts until he saw other police officers arriving at the scene.  *Id*.

Plaintiff states that the collisions were Ferdinand's fault and that she had chased him, causing him to collide with the other vehicle.  He alleges that, after he was handcuffed,

defendant HPD Officer Feddersen had placed his hands around plaintiff's neck and held him up off his feet, briefly cutting off his airway. He further alleges that he was denied an ambulance or medical treatment at the scene.

Defendant HPD Officer Beaudion attempted to perform field sobriety tests on plaintiff near the scene of the accident; defendants submitted a copy of the videotaped tests as summary judgment evidence. Plaintiff refused to take an alcohol breathalyzer test, and a warrant was issued for obtaining a sample of his blood for blood alcohol concentration ("BAC") purposes. Plaintiff was transported to Memorial Hermann Hospital, where a blood draw was obtained. Plaintiff claims that the nurse had to stick him twice to obtain the sample, and that defendant Feddersen jumped on him during the blood draw, breaking his back.

Following the blood draw, plaintiff was returned to the HPD downtown jail for booking and processing. Plaintiff told the officers that he was unable to walk, so he was transported through the building on a jail restraint chair and was lifted or carried to his bunk. The blood draw revealed that plaintiff's BAC was 0.145, well over the 0.08 legal limit for intoxication. (Docket Entry No. 16, p. 4.) Plaintiff subsequently pleaded guilty to driving while intoxicated and was sentenced to ten years' incarceration. *State v. Roberts*, No. 139483801010, 184th District Court of Harris County, Texas.

Plaintiff filed complaints with the HPD Internal Affairs Division ("IAD"), and his complaints were investigated. The IAD report, pages of which have been submitted by the parties as summary judgment evidence, made determinations unfavorable to plaintiff.

3

Plaintiff claims that defendants "broke his back," used excessive force, falsified records, committed "official oppression," failed to provide proper medical care, violated the Americans with Disabilities Act ("ADA") by not providing him a wheelchair, and ignored his complaints of pain and serious injury.[1] He seeks $10 million for physical and mental injuries.[2]

## II.  SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted when the moving party conclusively establishes that there is no genuine issue of material fact. FED. R. CIV. P. 56(c); *Chelates Corp. v. Citrate*, 477 U.S. 317, 323–25 (1986). There is no issue for resolution at trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party may satisfy its burden by negating the existence of an essential element of the nonmoving party's case. *Chelates Corp.*, 477 U.S. at 325. Alternatively, if the moving party will not bear the burden of proof at trial on a particular issue, it may meet its initial burden by pointing out the absence of evidence supporting that element of the nonmoving party's case. *Id.*; *Stilts v. Conoco, Inc.*,

---

[1] In his pending habeas lawsuit, plaintiff lists the claims being raised in this instant civil lawsuit as: (1) fabrication of evidence which led to a separate charge of driving while intoxicated against him, (2) a spinal fracture caused by a police officer's use of excessive force during a blood draw, and (3) deliberate indifference to his serious medical needs. *Roberts v. Davis*, C.A. H-16-2959 (S.D. Tex.), Docket Entry No. 16, p. 4.

[2] Plaintiff contends that, based on prior employment in medical billing and coding, he should be considered an "expert witness" as to the medical records. The Court declines to construe as expert testimony any allegations made by plaintiff in this lawsuit.

4

76 F.3d 651, 656 (5th Cir. 1996); *Transamerica Ins. Co. v. Avenall*, 66 F.3d 715, 718–719 (5th Cir. 1995).

Once the moving party has carried its burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996). The nonmoving party cannot discharge its burden by alleging legal conclusions or unsubstantiated assertions, nor can it rest on the allegations of the pleadings; instead, it must present affirmative evidence in order to demonstrate the existence of a genuine issue of material fact and defeat a motion for summary judgment supported by competent evidence. *Anderson*, 477 U.S. at 248–250; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). When the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* However, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Id.*

### III.  CLAIMS AGAINST THE CITY OF HOUSTON

Section 1983 provides a private right of action against parties acting under color of state law to redress the deprivation of rights secured by the United States Constitution or

federal law. *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003). Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To prevail on a section 1983 claim, a plaintiff must show that the offending conduct was committed by a person acting under color of state law and that the conduct deprived the plaintiff of rights secured by the Constitution or federal law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

A municipality such as the City of Houston (the "City") is a "person" subject to suit under section 1983 under certain circumstances. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978). Although a municipality cannot be held liable simply on a theory of *respondeat superior*, *id*. at 691, it can be held liable if a deprivation of a constitutional right was inflicted pursuant to an official policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Municipal liability requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010). Single instances of certain actions, behaviors, or decisions, even if unconstitutional, do not prove, or allow inference of, a policy, custom, or practice. *Piotrowski*, 237 F.3d at 581.

Plaintiff in the instant case has not identified and presented probative evidence of an actionable and unconstitutional policy or custom attributable to the City. *See Thompson v.*

6

*Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001).  No section 1983 claim is established against the City.

Plaintiff also alleges that the City violated his rights under the ADA by failing to provide a wheelchair for his use at the City Jail. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Thus, plaintiff here must prove that: (1) he is a qualified individual with a disability; (2) he was excluded from participation in, or denied the benefits of the services, programs, or activities of the City's jail, or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability.

Plaintiff fails to present probative summary judgment evidence establishing that he has a "qualifying disability" under the ADA.  Moreover, temporary conditions are generally not sufficient to rise to the level of a disability under the ADA. *Haralson v. Campuzano*, 356 F. App'x 692, 698 (5th Cir. 2009) (holding that prisoner did not have a "disability" within the meaning of the ADA where he was temporarily impaired in walking and breathing due to his cancer and cancer treatment).  Defendants are entitled to summary judgment dismissal of plaintiff's claims against the City of Houston.

7

To the extent plaintiff sues the individual defendants in their official capacities, his claims fail. The United States Supreme Court has noted that official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The City of Houston is a party to this lawsuit, and plaintiff's official capacity claims against the individual defendants are redundant. *See Johnson v. Hurtt*, 893 F. Supp.2d 817, 828 (S.D. Tex. 2012) ("[W]ith respect to Plaintiff's official capacity claims against Chief McClelland, the Court finds that these claims should be dismissed as they are simply another way of pleading against the City, which is already a party to this action.").

Defendants are entitled to summary judgment dismissal of plaintiff's claims against the individual defendants in their official capacity.

## IV.  CLAIMS AGAINST HOUSTON POLICE OFFICERS

Plaintiff raises the following claims against the following defendants in his original and supplemental complaints and more definite statement (Docket Entries No. 1, 14, 60).

A.    Police Chief Charles McClelland

Plaintiff sues former Houston Police Chief Charles McClelland for failure to train, failure to provide wheelchairs at all jails in violation of the ADA, and a "13 hour delay" in obtaining medical care.

To state an individual capacity claim under section 1983, a plaintiff must allege that while acting under color of state law, defendants were personally involved in the deprivation

8

of a right secured by the Constitution of the United States, or that defendants' wrongful actions were causally connected to such a deprivation. *James v. Texas Collin County*, 535 F.3d 365, 373 (5th Cir. 2008).

Plaintiff presents no probative summary judgment evidence of personal involvement by McClelland. He does not establish that McClelland was at the scene of the accidents or at the Houston jails or Memorial Hermann Hospital, or was otherwise personally involved in the events made the basis of this lawsuit. Further, he fails to present probative summary judgment evidence of a failure to train or supervise on the part of McClelland as to any of the individual defendants named in this lawsuit. To any extent plaintiff claims that McClelland was responsible for his not receiving information regarding the IAD report, plaintiff shows no federal constitutional or statutory right to receive the information, and no section 1983 claim is raised. Moreover, plaintiff acknowledges that his IAD complaints were investigated, and that he was personally interviewed by IAD officials during their investigation. Plaintiff fails to demonstrate the denial of any opportunity to be heard regarding his complaints.

Defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant McClelland.

B.    Officer C. McClain-Ferdinand

Plaintiff's allegations against defendant Ferdinand raise no issues of federal constitutional dimension. His claim for official oppression fails as a matter of law under section 1983. Official oppression is a state criminal offense and not a private cause of action

that can be lodged by a citizen against a police officer. *See* TEX. PENAL CODE § 39.03. Under Texas law, "official oppression is a criminal offense rather than an intentional tort." *Callis v. Sellars*, 953 F. Supp. 793, 800 (S.D. Tex. 1996).

Moreover, plaintiff's disputes regarding causation or liability for the three motor vehicle collisions are matters of state tort law, not federal constitutional law. During their investigation of the accidents, police officers became aware of plaintiff's potential intoxication. As a result of those direct interactions with plaintiff, plaintiff was offered field sobriety tests and a breathalyzer test. When plaintiff refused both tests, a warrant for a blood specimen was obtained, and plaintiff's blood was drawn at a local hospital. It is uncontested that plaintiff's blood alcohol level was measured at 0.145, well over the 0.08 blood alcohol level required for legal intoxication, and that he was arrested and successfully prosecuted for driving under the influence of alcohol. Plaintiff's disagreements with Ferdinand's actions and statements regarding the accidents do not give rise to a constitutional issue under section 1983.

Nor does the probative evidence show that Ferdinand violated plaintiff's constitutional rights by failing to render aid at the scene of the third accident. Plaintiff complains that Ferdinand did not have him transported by ambulance to a hospital following the third collision. The Court liberally construes plaintiff's assertion as a claim for deliberate indifference to his serious medical needs. To prevail on his claim, plaintiff must present competent summary judgment showing that Ferdinand "refused to treat him, ignored his

10

complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Plaintiff presents no competent evidence that he had any serious medical needs at the time he interacted with Ferdinand. To the extent he alleges that he was unable to walk after the accident, he concedes that his field sobriety test videotape, taken shortly after the third accident, shows him walking, talking, and refusing to take any intoxication-related tests. Moreover, the record shows that plaintiff was examined for any serious injuries at the Houston City Jail. Plaintiff's disagreement with Ferdinand's actions does not state a claim for deliberate indifference, *Norton v. Dimizana*, 122 F.3d 286, 292 (5th Cir. 1997), and simple or even heightened negligence is insufficient to establish deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). No deliberate indifference is shown in the record.

Defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant Ferdinand.

C.    Officer K. Feddersen

Plaintiff alleges that, at the scene of the third collision, defendant Feddersen was guilty of official oppression by placing his hands around plaintiff's neck, raising him off the ground, and momentarily cutting off his air. Defendants argue, and plaintiff does not dispute, that none of the police videotapes of the accident scene show that this event occurred. The Supreme Court has clarified that, "when opposing parties tell two different stories, one of

which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff contends that third-party witness Ashlin Johnson saw Feddersen's actions and could verify plaintiff's version of the events. However, plaintiff has not presented any testimony or other evidence from Johnson. Plaintiff's speculation and bald assertions as to what Johnson may have seen or might say do not raise a genuine issue of material fact precluding summary judgment. *See Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir.1990); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983). Regardless, claims of official oppression are matters arising under Texas criminal law and do not constitute federal constitutional issues. *See Callis*, 953 F. Supp. at 800.

Defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant Feddersen.

### D.    Sergeant R. Espinoza

Plaintiff asserts that defendant Espinoza was deliberately indifferent to his health, safety, and serious medical needs by not transferring him to a handicapped jail facility and in "allow[ing] Plaintiff to craw [sic] and struggle to get to his jail cell."

In responding to the City of Houston IAD investigation of plaintiff's claims, Espinoza stated in writing as follows:

On July 16, 2013, I was assigned as the Livescan area Sergeant of the Central Jail on night shift.

I never arrived nor left the location of the scene since I was on duty at the Central Jail.   Until watching the video I did not remember dealing with [plaintiff].

\* \* \* \*

I did not witness [plaintiff] being dragged at any time.  [He] was transported to central jail by way of patrol car.  When [he] arrived at Central Jail, he was uncooperative and would not walk to the different stations of the booking process.  To facilitate matters and to expedite [plaintiff's] process, I utilized the jail's restraint chair which has wheels.  When [plaintiff] was helped, he was picked up by his arms.  I assisted [plaintiff] get into the chair after he was photographed and printed.  I then wheeled him out of the Livescan area and into the Class C section of the jail where he was given an opportunity to speak with Jail Medical Specialists.  I then wheeled him into the elevator and arrived on the sixth floor housing area of the jail.

On the housing floor, the hallway in the jail blocks leading to individual cells was not wide enough for the restraint chair so at the entrance to cell block F, [plaintiff] got off the chair by his own efforts.  I helped him get off the floor as I reached out and he grabbed my arm and helped himself to stand up.  The hallway is not wide enough for two people to walk side-by-side, so [plaintiff] took hold of the bars lining both sides of cell block F and walked to his cell.

(Docket Entry No. 98-5, pp. 4–5.)

Nothing in the record establishes that plaintiff was legally disabled or that he warranted transfer to a handicapped jail facility, and his complaint of not being provided a bona fide wheelchair does not give rise to a constitutional violation.  It is clear that plaintiff would not walk on his own following his return to the jail for booking and processing.  Whether this was

an actual inability due to injury or a deliberate refusal to cooperate is not discernable from the record; in either event, no deliberate indifference is shown.

A claim for deliberate indifference to a prisoner's health and safety requires proof that an officer knew of and disregarded an excessive risk to the inmate's physical health or safety, and that the inmate suffered physical harm or injury as a result. The inmate must show that the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that the officer did in fact draw the inference and disregarded it. The failure of an officer to alleviate a significant risk which he should have perceived, but did not, does not constitute deliberate indifference. Moreover, mere negligence or a lack of reasonable care which falls short of being deliberately indifferent does not give rise to a constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994); *Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995).

In the instant case, Espinoza was of the belief that plaintiff's actions were an intentional and voluntary refusal to walk: "When [he] arrived at Central Jail, he was uncooperative and would not walk to the different stations of the booking process." (Docket Entry No. 98-5, p. 4.) That is, Espinoza did not believe that plaintiff was unable to walk. Nevertheless, Espinoza found a wheeled chair for plaintiff's use, and took it upon himself to wheel plaintiff to various places throughout the jail during his booking and processing. When

14

an area was impassible by chair, plaintiff was lifted or carried.  When physical limitations of the jail itself did not allow plaintiff to be lifted or carried, Espinoza helped plaintiff reach his cell as plaintiff grabbed Espinoza for support and held on to cell bars.

Plaintiff presents no probative summary judgment evidence that Espinoza knew that not providing plaintiff with an actual wheel chair presented a significant risk of serious harm to plaintiff, that he deliberately disregarded that risk, and that plaintiff was harmed as a result. Nor does he present competent evidence showing that Espinoza had any authority to transfer plaintiff to a handicapped booking facility or that such a facility was available and required by plaintiff.  No deliberate indifference is shown, and defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant Espinoza.

E.    Sergeant J. Rubio

Plaintiff claims that defendant Rubio was deliberately indifferent to plaintiff's serious medical needs and that he failed to provide a reasonable response to plaintiff's IAD complaint.  He also appears to claim that Rubio used excessive force in restraining plaintiff during the blood draw, breaking plaintiff's back.

In responding to the City of Houston IAD investigation of plaintiff's claims, Rubio stated in writing that he had been working security at Memorial Hermann Hospital the night of July 16, 2013.  (Docket Entry No. 98-5, p. 17.)  In his synopsis of the events, he reported as follows:

15

> I was sitting in the emergency room when at approximately [2:30 a.m.], I observed a female Houston Police Officer bring in a white male for a blood draw regarding a DWI arrest. I noted the white male was intoxicated and irate as he shouted profanity inside the emergency room. Moments after, Sergeant Gonzales and Sergeant Chebret arrived to assist the arresting officer. [Plaintiff] was escorted into a room which was secluded from the public view. It was located in the emergency room. I assisted with the incident and walked inside the room with Officer Beaudion, Sergeant Chebret, and Sergeant Gonzales.
>
> We waited while the in-take nurse prepared for the blood draw. During the wait, [plaintiff] made a statement that he was going to take our guns from us. He was very uncooperative during the wait as he constantly shouted profanity. When the nurse was ready, we used force to place him on a gurney. Sergeants Chebret, Gonzales, and I restrained [plaintiff] so that the nurse could extract his blood. I restrained his legs during the blood draw. After the nurse had extracted the blood, [plaintiff] was escorted by Sergeant Gonzales and Sergeant Chebret. I walked behind them and saw that [plaintiff] had become lame, requiring Sergeants Gonzales and Chebret to hold him up by his arms and escort him to the patrol vehicle.

*Id.*

Plaintiff does not controvert defendant's statements that he had threatened the officers. Rather, he complains that the officers used excessive force in restraining him because he had been handcuffed at the time and could not have taken a gun from the officers. The Court finds plaintiff's argument unpersuasive. In light of plaintiff's threats that the officers would need to fight him to get the blood draw and that he would grab a gun from the officers, it was not unreasonable for the officers to take the threats seriously and take steps to protect everyone's safety. Using force to physically restrain plaintiff during the procedure was not unreasonable under the circumstances, and no use of excessive force is shown. Further, and

as is discussed under Part V, *infra*, the competent summary judgment evidence does not establish that plaintiff suffered a "broken back" as a result of any defendant's actions.

Plaintiff also contends that Rubio was deliberately indifferent in noticing plaintiff "become lame" after the blood draw but doing nothing in response. Rubio stated that Gonzales and Chebret held plaintiff up by his arms and escorted him to a patrol car. Plaintiff presents no probative summary judgment evidence showing that Rubio knew that the two officers posed a significant risk of serious harm to plaintiff, that he deliberately disregarded that risk, and that plaintiff was harmed as a result. No deliberate indifference is shown, and defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant Espinoza.

Plaintiff fares no better in claiming that Rubio violated his constitutional rights in failing to provide a "reasonable" response to his IAD complaint. The IAD report determined, in relevant part, that

> Officer Beaudion arrested [plaintiff] for suspicion of "Driving While Intoxicated" and transported him to Memorial Hermann Hospital for a blood draw. Once at the hospital, [plaintiff] refused to cooperate in allowing medical personnel to obtain his blood. Officer Beaudion requested her supervisors, [Gonzales and Chebret], to assist her at the hospital. As medical personnel began to take the blood draw, [plaintiff] began to resist and become combative. [Gonzales, Chebret, and Rubio] had to restrain [plaintiff] during the blood draw for everyone's safety.
>
> Once the blood draw was completed, [plaintiff] displayed passive-aggressive behavior and would not walk. [Gonzales and Chebret] supported [plaintiff] by each arm and carried him to the patrol vehicle. Upon arrival at central jail, [plaintiff] refused to walk on his own again. [Gonzales and Chebret] had to

support [plaintiff] by each arm and carried him to the booking area. . . . The jail video footage taken from Camera #20 at [3:04 a.m.] shows [Gonzales and Chebret] carrying, not dragging, [plaintiff] to the booking entrance.

Once in the jail, the video reveals [plaintiff] not wanting to walk.  The video reveals various jail personnel going out of their way to assist [plaintiff] in moving around to different portions of the jail.  The video does not show any jail personnel dragging [plaintiff].

The medical records note that [plaintiff] has osteophytes [bone spurs] and a preexisting compression fracture to the lumbar area of the spine.  The medical records do not note any injuries to the neck that would be consistent with [plaintiff's] allegation.

\*    \*    \*    \*

[Plaintiff's] claim that he was dragged to the jail are false.  The video reveals that [Gonzales and Chebret] supported [plaintiff] by each arm and assisted him, while he was walking to the booking Live Scan entrance.  The evidence determines that [plaintiff's] claim is fabricated.

(Docket Entry No. 98-4, pp. 3, 5.)

Plaintiff enjoyed no federally-protected right to a satisfactory outcome of the IAD investigation, nor did he have a constitutional or federal statutory right as a state prisoner to receive a copy of the final IAD report.  His complaints were investigated, and he was interviewed by IAD officers.  No constitutional violation is shown.

Defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant Rubio.

F.    Sergeant B. L. Chebret

Plaintiff complains that defendant Chebret used excessive force in restraining plaintiff during the hospital blood draw, resulting in a broken back. He further claims that Chebret was deliberately indifferent to his safety and serious medical needs by physically dragging him out of the hospital and from the patrol car into Central Jail, causing additional pain and injury.

In responding to the City of Houston IAD investigation of plaintiff's claims, Chebret stated in writing as follows:

> I, Sergeant B. L. Chebret, was riding unit 97Z01 on July 16, 2013, assigned as a two man unit with Sergeant R. Gonzales who rides unit 96Z02. At approximately [3:00 a.m.], we received a phone call from Officer A. Beaudion requesting our presence at Hermann Hospital to assist with an unruly suspect. Upon our arrival to the hospital we met with Officer Beaudion near a Triage room and observed that the suspect was standing nearby in handcuffs. At that time the suspect, who had a strong odor of alcoholic beverage on his breath, red glassy eyes and slightly slurred speech was being loud and unruly. The suspect made threats to take one of our guns and that we would have to fight him to get a sample of his blood.
>
> During the course of the blood draw at Hermann Hospital, [plaintiff] was restrained by me, Sgt. Gonzales and Sgt. Rubio, who was working an extra job at the hospital. I held the suspect['s] arm and hand steady to prevent injuries to him and the nurse as the blood draw was performed. I observed that Sgt. Gonzales held his head steady and Sgt. Rubio held [plaintiff's] legs down on the hospital bed to further prevent his movements. The blood draw was performed at [3:42 a.m.] at which time Sergeant Gonzales and I escorted the suspect to Officer Beaudion's patrol car. The suspect was acting as if he could not walk and we had to support most of his weight as we took him to the patrol car.

19

> Sgt. Gonzales and I met with Officer Beaudion at the Central Jail and assisted
> with his escort to the prisoner intake door.  Sgt. Gonzales and I again had to
> support the weight of [plaintiff] as we escorted him to see the medical screener.

(Docket Entry No. 98-5, p. 15.)

For the same reasons plaintiff's claims against defendant Rubio failed, his similar

claims against Chebret must fail.  Chebret states that, "[Plaintiff] made threats to take one of

our guns and that we would have to fight him to get a sample of his blood."  Chebret was not

unreasonable in taking these threats seriously and in using force to physically restrain plaintiff

during the blood draw.  Plaintiff does not establish that the force used to restrain him during

the procedure was excessive or unnecessary under the circumstances.  Further, and as is

discussed under Part V, *infra*, the competent summary judgment evidence does not establish

that plaintiff suffered a "broken back" as a result of any defendant's actions.

Moreover, as with defendant Espinoza, Chebret clearly stated that he did not believe

plaintiff was unable to walk: "The suspect was acting as if he could not walk and we had to

support most of his weight as we took him to the patrol car.  Sgt. Gonzales and I met with

Officer Beaudion at the Central Jail and assisted with his escort to the prisoner intake door.

Sgt. Gonzales and I again had to support the weight of [plaintiff] as we escorted him to see

the medical screener."   (Docket Entry No. 98-5, p. 15.)   Plaintiff presents no probative

summary judgment evidence that Chebret knew that holding plaintiff up and carrying him

presented a significant risk of serious harm to plaintiff, that he deliberately disregarded that

risk, and that plaintiff was harmed as a result.  Although plaintiff claims that Chebret dragged

20

him from the patrol car into the jail, he presents no probative summary judgment evidence establishing that he was dragged, not carried. No deliberate indifference is shown, and defendants are entitled to summary judgment dismissal of plaintiff's claims against Chebret.

G.     Sergeant R. Gonzales

Plaintiff complains that defendant Gonzales used excessive force in restraining plaintiff during the hospital blood draw, resulting in a broken back. He further claims that Gonzales was deliberately indifferent to his safety and serious medical needs by physically dragging him when he was unable to walk, causing additional pain and injury.

In responding to the City of Houston IAD investigation of plaintiff's claims, Gonzales stated in writing as follows:

> I Sergeant R.C. Gonzales was riding unit 96Z02 on July 16, 2013, assigned as a two man unit. At about [3:00 a.m.] Sergeant Chebret and I were contacted by Officer Beaudion who stated the DWI suspect she transported to the hospital was making threats and was going to give her problems while trying to serve the warrant for his blood. We arrived at Hermann Hospital, in the Medical Center, and upon entering observed Officer Beaudion with the suspect, [plaintiff], in handcuffs. [Plaintiff] was being loud, yelling threats towards the officers and using profanity. [Plaintiff] was saying he was going to try and take the officers' weapons during the blood draw and that we were going to have to fight him in order to serve the warrant. The warrant was served at about [3:42 a.m.] and Sergeant Chebret and I then escorted [plaintiff] to Officer Beaudion's [patrol car].
>
> I never made the scene of the accident nor could I comment on [plaintiff's] demeanor at the scene. I only spoke to Officer Beaudion at Central Intox and at the hospital in regards to [plaintiff's] actions and combative attitude. While at Intox and at the hospital I never saw any observable injuries to [plaintiff] nor did I see him have any problems walking at Intox or the hospital upon our arrival. In both instances there were obvious signs of intoxication exhibited [by

plaintiff], strong [odor], blood shot eyes, slurred speech, and combative behavior.

Upon serving the warrant at the hospital, Sgt. Chebret and I along with Sgt. Rubio who was working an extra job at the hospital placed [plaintiff] on a gurney and restrained his legs, arms, and head while the nurse drew his blood. [Plaintiff] was restrained to ensure his safety [as well as] the officers' and nurse's safety due to his combative behavior and threats being made toward the officers.

\* \* \* \*

Sgt. Chebret and I took [plaintiff] to Officer Beaudion's [patrol car] after the warrant was served. [Plaintiff] did not want to walk and began to state he could not walk after he was standing in the hospital. We had [plaintiff] by each arm and he was carried not dragged to the vehicle. [Plaintiff] continued to be passive aggressive once transported to Central where we met Officer Beaudion and assisted [plaintiff] to the booking area. No injuries were observed at any time during the time we dealt with [plaintiff] and he would walk intermittently as we escorted him to the booking area.

(Docket Entry No. 98-5, pp. 11–12.)

Again, the record does not show that Gonzales and the other defendants used excessive force in physically restraining plaintiff during the blood draw. Plaintiff had told the officers that they would need to fight him for the blood draw, and threatened to take a gun from them. As stated by Gonzales, "[Plaintiff] was restrained to ensure his safety [as well as] the officers' and nurse's safety due to his combative behavior and threats being made toward the officers." *Id*. Further, and as is discussed under Part V, *infra*, the competent summary judgment evidence does not establish that plaintiff suffered a "broken back" as a result of any defendant's actions.

22

Moreover, Gonzales, as with the other defendants, did not believe that plaintiff was unable to walk. As stated by Gonzales, "[Plaintiff] did not want to walk and began to state he could not walk after he was standing in the hospital. We had [plaintiff] by each arm and he was carried not dragged to the vehicle. [Plaintiff] continued to be passive aggressive once transported to Central . . . . [He] would walk intermittently as we escorted him to the booking area." *Id*. Plaintiff presents no probative summary judgment evidence that Gonzales knew that holding plaintiff up and carrying him presented a significant risk of serious harm to plaintiff, that he deliberately disregarded that risk, and that plaintiff was harmed as a result. Although plaintiff claims that Gonzales dragged him from the patrol car into the jail, he presents no probative summary judgment evidence establishing that he was dragged, not carried. No deliberate indifference is shown, and defendants are entitled to summary judgment dismissal of plaintiff's claims against Gonzales.

H.     Officer A. Beaudion

Plaintiff complains that defendant Beaudion violated his Fourth Amendment protections against unreasonable search and seizure by executing an unlawful blood draw warrant, and that she used excessive force during the blood draw.

In responding to the City of Houston IAD investigation of plaintiff's claims, Beaudion stated in writing, in relevant part, as follows:

> Upon approaching [plaintiff] I could smell a strong odor of alcohol on the suspect's breath. He appeared to be agitated, and frustrated with how he had been treated by Officers on scene. The suspect did admit to me that he drank

23

two Budweiser beers. I asked the suspect while on scene did he have any injuries from the accident and he stated no. I observed no visible injuries to the suspect. I then proceeded with the field sobriety test and the suspect was unable to complete [the] HGN test due to him stating he had poor vision. I then asked the suspect to perform the one leg stand test and he stated he can't complete the test because "he could not see the line." I then read the DIC-24 and requested the suspect's blood and he refused.

\*   \*   \*   \*

I then left the scene at [11:44 p.m.] and transported the suspect to Central Intox to place him in the holding cell while I contacted [a district attorney] to draft a search warrant for the suspect's blood. I arrived at Central Intox at [11:55 p.m.]. Once I was able to get a signed copy of the warrant by a judge, I transported the suspect to Memorial Hermann Hospital and arrived at [1:46 a.m.]. I then escorted the suspect inside of the hospital, and it was at that point the suspect beg[a]n stating that he was not going to allow the nurse to draw his blood even though I had a search warrant signed by the judge. I contacted Sergeant Chebret who b[r]ought Sergeant Gonzales along to help in obtaining the suspect['s] blood. Once they arrived and met with me in the waiting room the suspect stated that [] officers better not leave there [sic] guns unguarded because "I [sic] going to take them and use it." As the nurse began to draw the suspect's blood the suspect had to be held down by Sergeant Chebret, Sergeant Gonzales, and a HPD unit that was working an extra job. The suspect then began to kick one of his legs and I had to hold his leg down to keep him from kicking one of the officers. Once the blood was taken the suspect was then placed in handcuffs and was escorted back to my patrol car. At no point do I recall the suspect stating that he needed medical treatment or that he was injured when leaving the hospital. I do not recall the suspect being dragged by an officer or sergeant at the hospital.

I then transported the suspect back to central intox at [1:56 a.m.] to have the suspect booked at central jail. I arrived at central intox at [2:55 a.m.].

\*   \*   \*   \*

Upon my arrival to Central Intox [plaintiff] walked into central intox on his own without any assistance from me. After I obtained a search warrant I then transported the suspect to Memorial Hermann Hospital and the suspect walked

24

to my vehicle on his own without any assistance from me. After the suspect['s] blood was drawn the suspect had to be carried out of the hospital to my patrol car by Sgt. Chebret and Sgt. Gonzales because he stated that he could not walk. I then transported the suspect back to central intox.

(Docket Entry No. 98-5, pp. 2–3.)

Plaintiff's claim that the blood draw warrant was unlawful and a violation of his Fourth Amendment rights is conclusory and unsupported by probative evidence in the record. His disagreements with the evidence used to obtain the warrant are conclusory and provide no basis for denying summary judgment. Moreover, plaintiff pleaded guilty to the driving while intoxicated charge which relied on the results of the blood draw warrant, and he did not contest the validity of the warrant. Plaintiff fails to show that, in requesting and obtaining the blood draw warrant, Beaudion violated his Fourth Amendment protections.

Nor does he establish that Beaudion used excessive force in helping restrain plaintiff during the blood draw. Beaudion stated that plaintiff began kicking one of his legs during the procedure, and that she held the leg down to keep him from kicking the officers. Her actions were not unreasonable under the circumstances. Moreover, plaintiff does not show that her actions caused him serious physical injury. As is discussed under Part V, *infra*, the competent summary judgment evidence does not establish that plaintiff suffered a "broken back" as a result of any defendant's actions.

Defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant Beaudion.

## V.   DELIBERATE INDIFFERENCE AS TO MEDICAL CARE

Plaintiff sues Chidi Nnaka, M.D., for unlawfully altering plaintiff's medical records.[3] As proof, plaintiff submits pages of records and documents that have been defaced with his own handwritten comments, notes, and changes setting forth his disagreement with their content. (Docket Entry No. 98.)  Many of his arguments and handwritten comments direct the Court to matters that are not in the record.

Regardless, allegations that medical records were altered or falsified does not state an issue of constitutional dimension. *See, e.g., Howe v. Polunsky Unit*, C.A. No. 9:08-CV-142, 2010 WL 5640804, *8 (E.D. Tex. Nov. 30, 2010); *Boone v. Buchanan*, C.A. No. 6:07-CV-242, 2008 WL 744247, *15–16 (E.D. Tex. Mar.19, 2008) ("The claim that the medical records have been falsified is not itself a constitutional violation").  Thus, plaintiff's assertions that Nnaka altered or falsified his medical records does not state a claim for which relief can be granted under section 1983.

Plaintiff also sues Nnaka for deliberate indifference to his serious medical needs. Because he was a pretrial detainee and not a convicted inmate at the time, plaintiff's deliberate indifference claims arise from the alleged deprivation of substantive due process under the Fourteenth Amendment, not the Eighth Amendment.  *Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998).  Nevertheless, the Fifth Circuit Court of Appeals

---

[3]Plaintiff withdrew his claims of negligence and malpractice against Nnaka. (Docket Entry No. 98-2, p. 9.)

applies the same standard for assessing constitutional claims of denial of medical care to pretrial detainees under the Fourteenth Amendment as it does for denial of medical care to convicted inmates under the Eighth Amendment. *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

To prevail under the "extremely high standard" of deliberate indifference, a prisoner "must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "An incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." *Id.* Moreover, "unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." *Id.* Deliberate indifference is especially difficult to show when the inmate has been provided with ongoing medical treatment. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). The decision not to provide additional or different treatment "is a classic example of a matter for medical judgment" rather than a basis for a deliberate indifference claim. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Domino*, 239 F.3d at 756.

Moreover, an inmate's disagreement with medical treatment does not state a claim for deliberate indifference. *Norton v. Dimizana*, 122 F.3d 286, 292 (5th Cir. 1997). Records showing that an inmate was given medical examinations, treatments, and medications may

rebut an inmate's allegations of deliberate indifference in denying or delaying medical care. *See Varnado v. Lynaugh*, 920 F. 2d 320, 321 (5th Cir. 1991).

Plaintiff claims that Nnaka ignored his complaints of leg numbness and inability to walk, failed to provide him with a wheelchair, and offered him nothing more than aspirin for his pain. Plaintiff contends that he had a "broken back" and that Nnaka should have transferred him to a hospital for x-rays and a "full body cast" because the broken spinal bones "fused" after two days without treatment. Plaintiff states that, as a result of Nnaka's deliberate indifference, he sustained a permanent spine injury that will require surgery.

In his affidavit submitted in support of the motion for summary judgment, Nnaka testifies in relevant part as follows:

> I was hired by the City of Houston (the "City") as a Jail Medical Specialist in 2013. As such, I perform intake medical screens and physical examinations of detainees in City jails.
>
>                \*       \*       \*       \*
>
> Generally, when a detainee arrives at the jail, the detainee is first taken to Intake Medical Screening. The screener obtains the detainee's medical history and documents observations about the detainee's physical and mental state. The screener determines if the detainee is medically fit to be booked into] jail, needs to be seen by a jail medical specialist in the jail clinic after booking, or requires treatment in a hospital. If it is determined that a detainee needs to be seen by a jail medical specialist after booking, the detainee is given a pink or purple wristband to indicate such.
>
> On July 16, 2013, I was working the night shift – 10:00 p.m. to 6:30 a.m. – at the Houston Police Department's central jail located at 61 Riesner Street, Houston, Texas.

I did not screen [plaintiff]. A sergeant brought [plaintiff] to the jail clinic after he was medically screened and booked. I physically examined him at approximately 3:15 a.m. on July 17, 2013. The medical records of this examination are attached to this Declaration as Exhibit 1. The duration of the examination was approximately 25 minutes. [Plaintiff] walked in and out of the jail clinic by himself.

First, I received [plaintiff's] written consent to perform the examination. Then I performed a standard examination as documented in Exhibit 1. I asked [plaintiff] a number of questions about his medical history. He told me that he had a history of Coronary Artery Disease ("CAD") and asthma. I took his pulse and blood pressure, both of which were in normal ranges. I asked [plaintiff] about his present illness. He complained of generalized body pain. He could not pinpoint the pain to a particular part of his body. On a scale of 1–10, with 10 being the worst, he rated his pain at 5. During the examination, I did not observe any wounds, abrasions, or bruising to his body. In fact, I noted that his skin was intact, meaning that there were no wounds. If I had observed any injuries, I would have noted such in the medical records and would have created a sketch of where the injuries are located on the body.

During the examination I offered [plaintiff] 800 mg of ibuprofen for his generalized pain. [He] walked to the sink to get a drink of water in order to swallow the medication. I advised that ibuprofen [was] to be given as needed. Based on his medical history, I also advised that Nitroglycerine [was] to be given as needed for any chest pain and an Albuteral inhaler to be given as needed for his asthma.

I only examined or saw [plaintiff] on this one occasion.

[Plaintiff] was rude, hostile, and aggressive towards me throughout the examination. He repeatedly cussed at me. He also threatened to sue me. He appeared intoxicated.

[Plaintiff] did not request X-rays, nor were X-rays ever discussed. He never complained of pain in his back or legs. He never stated that he could not feel his legs. My examination did not uncover any injuries to his back or legs. Furthermore, the manner in which [plaintiff] was moving and walking indicated that he was not suffering from back or leg pain. [He] did not request to be

> taken to a hospital, and my examination did not uncover a medical need for
> [him] to be taken to a hospital.
>
> [Plaintiff] never stated that he was injured by police officers or that he felt
> mistreated by police officers.

(Docket Entry No. 94-2, pp. 1–3.)   A review of Nnaka's medical records for plaintiff reveals

a notation that plaintiff told Nnaka he had generalized body pain "sustained while resisting

an arrest from HPD officers." *Id.*, p. 4.

The records do not support plaintiff's allegation of a 13-hour delay in his medical

examination or treatment. Plaintiff attaches an incomplete copy of a jail video synopsis, again

defaced with his own markings, notations, and comments. (Docket Entries No. 98-1, p. 1, No.

98-2, pp. 1–2.)   Although plaintiff construes the synopsis as a frame-by-frame time line

analysis, it is a compilation of "key points" made by an IAD investigator from various

cameras throughout the jail facility.   (Docket Entry No. 98-1, p. 1: "Sergeant Bonaby

reviewed the video footage and observed these key points in time.")   Contrary to plaintiff's

allegations, the key-points synopsis is not a complete real-time analysis of all events that

occurred during plaintiff's detainment at the jail.   Nor does the synopsis indicate the purpose

for any of plaintiff's transports throughout the jail on the wheeled chair.   Plaintiff's

assumption that the synopsis proves a 13-hour delay in his medical examination is speculative,

conclusory, and unsupported by probative summary judgment evidence in the record.   Even

assuming there were a thirteen-hour delay, plaintiff presents no competent summary judgment

30

evidence establishing that the delay caused additional injuries or exacerbated any existing injuries.

Further, plaintiff fails to present probative summary judgment evidence that Nnaka was deliberately indifferent in not transporting plaintiff to a hospital for x-rays. The medical records show that Nnaka examined plaintiff and provided him with pain medication; Nnaka's affidavit testimony shows that his examination uncovered no medical need for sending plaintiff to a hospital. Moreover, plaintiff presents no competent evidence that he was injured by not being sent to a hospital for x-rays. To the contrary, following plaintiff's release from the Houston City Jail and his transfer to the Harris County Jail, he was examined by a Harris County Jail medical provider on July 18, 2013. The medical provider noted in plaintiff's chart, "Asthma and Cardiac medical history. States unable to stand since motor vehicle accident. Seizure and mental health issues." (Docket Entry No. 98-3, p. 15.) X-rays were apparently taken, and the medical provider made a consultation request for "Chronic Back/Disc," "L/spine L1 bone osteophytes collapsed, L5 bone collapsed, S1 shifted, Gait affected." *Id.* The record made no finding that plaintiff's condition was due to recent trauma, or that the condition itself was recent. To the contrary, plaintiff's back/disc condition was termed "chronic."[4] A bottom bunk and cane were recommended, but no specific treatment plan was indicated. *Id.*

---

[4]"Chronic" is defined as "persisting for a long time." Dorland's Pocket Medical Dictionary (25th ed. 1995).

Plaintiff claims that, upon his arrival at the Harris County Jail, a physician told him, "You should have immediately been transfer [*sic*] to a hospital and placed in a full body cast. As a result of the delay, the vertebra [*sic*] are fused in place and will take surgery to correct." (Docket Entry No. 98-3, p. 18.)  No competent summary judgment evidence supports this statement, and it constitutes rank hearsay without evidentiary value. *See Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997) (holding hearsay inadmissible to oppose a motion for summary judgment); *Cormier v. Pennzoil*, 969 F.2d 1559, 1561 (5th Cir. 1992) (holding that a court may not consider hearsay contained in an affidavit when ruling on a summary judgment motion).

In absence of competent summary judgment evidence, plaintiff's claims of deliberate indifference regarding Nnaka's examination and treatment constitute little more than his disagreement with Nnaka's medical care.  Disagreement with medical care, without more, does not give rise to deliberate indifference. *See Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir.1993) (holding that disagreement over course of treatment does not state actionable civil rights claim); *see also Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006) (holding that prisoner's disagreement with his medical care does not constitute deliberate indifference).

Defendants are entitled to summary judgment dismissal of plaintiff's claims against defendant Nnaka.

## VI.   CONCLUSION

Defendants' motion for summary judgment (Docket Entry No. 94) is **GRANTED**, and this lawsuit is **DISMISSED WITH PREJUDICE**.   Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the $\underline{31}^{st}$ day of March, 2017.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

33